FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2011 NOV 30  P 3: 21

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

RODNEY PITTS, JR.                    *

Plaintiff                            *

v.                                   *        Civil Action Case No.  JKB-11-397

RICHARD ELLIOTT, JR., et al.         *

Defendants                           *
                              ***

## MEMORANDUM

Rodney Pitts, Jr. ("Pitts"), is suing Officer Richard Elliott, Jr., Officer Tracy Turner, Suzette Davis, Rosalind Roberts, Major Richard Elliott, Sr., Warden George Kaloroumakis, Officer Ben Larsen, Sgt. Stevenson, Officer Jackson, Officer Hopkins, Lieutenant Deal,[1] Sgt. Bare, and Sgt. Scott Cook under 42 U.S.C. § 1983.  A motion to dismiss, or in the alternative for summary judgment, has been filed by counsel on behalf of defendants Bare, Davis, Deal, Richard Elliott, Sr., Richard Elliott, Jr., Hopkins, Jackson, Kaloroumakis, Larsen, Roberts, Stevenson, and Turner  ("the corrections defendants") (ECF No.  20) and Maryland State Police Sgt. Scott Cook (ECF No. 31). Pitts has replied to the dispositive motions.  ECF Nos. 33 and 41. The case is ripe for disposition and the court now rules pursuant to Local Rule 105.6 (D. Md. 2011), no hearing being necessary.

---

[1] Lieutenant Deal's name is misspelled in the Complaint as "Deale."  It is properly spelled "Deal."  The Clerk will be directed to amend the docket accordingly. Service has not been made on Nurse Lisa. Plaintiff fails to indicate any injury sustained from her alleged actions or provide any detail in support of his claim that she was responsible for not delivering his prescription medicines. Complaint, ¶ 16.  If he wants to pursue claims against Nurse Lisa, he may do so in a separate complaint. Pitts's eleventh hour requests to add additional defendants, including the judge who presided over his trial, an assistant state's attorney, his trial counsel, and an expert witness at his trial (ECF Nos. 37 and 41) will be denied by separate order.

## I. BACKGROUND

Pitts's claims arose during the time he was confined at the Wicomico Detention Center ("Detention Center").[2] In his complaint, he presents claims of excessive force and violations of due process, equal protection, and the Fourth Amendment. Specifically, he alleges: 1) defendants Elliott, Davis, Turner, and Hopkins illegally tampered with his mail in violation of the Fourth Amendment and in violation of his right to due process, and equal protection; 2) defendants Larsen, Jackson, Bare, and Stevenson used excessive force against him; 3) defendant Elliott Jr. unlawfully harassed, and retaliated against him, violated his privacy, and used excessive force against him; 4) defendants Elliott Sr. and Kaloroumakis showed deliberate indifference to his safety and violated his right to equal protection and due process; 5) defendants Roberts and Kaloroumakis showed deliberate indifference to his conditions of confinement; and 6) defendants Deal and Stevenson showed deliberate indifference to his serious medical needs. Pitts requests compensatory and punitive damages of unspecified amount and declaratory judgment. Complaint, Part V. [3]

## II. PLAINTIFF'S ALLEGATIONS OF FACT

Pitts makes the following allegations in the complaint.

### A. October 27, 2009, Assault

On October 27, 2009, Stevenson, Davis, Schoolfield, and other correctional personnel went to Pitts's cell, stripped him of clothing and property, and placed him on suicide watch. Pitts claims that neither his conduct nor his statements warranted placement on suicide watch, and the

---

[2] Pitts was incarcerated at the Detention Center from September 8, 2009, to April 1, 2010. During that time he was both a pretrial detainee and, after sentencing, a convicted prisoner.

[3] The complaint is handwritten and seventeen pages long. Mindful that Pitts is self-represented, the court construes his pleadings liberally.

officers used excessive force by choking him. After all the officers except Stevenson left the cell, Stevenson sprayed Pitts with pepper spray. The water in the cell was "inactive" and Pitts used water from the toilet to wash. He was not permitted to be seen by medical personnel until approximately two hours later. Pitts remained in the cell even though the mattress and wall had pepper spray on them. Complaint, p. 6.

On that same day at approximately 4:30, Pitts was put in a holding cell in the booking and intake unit, handcuffed, and shackled. One hour later, Deal, Bare, Larson, Jackson, Williams, and Harp, all wearing protective clothing, entered his cell. Larson entered first and head-butted Pitts, who was on the bunk, causing Pitts to bleed from the mouth, nose, and left side of his face and eye.[4] Larsen grabbed Pitts, slammed him on the floor, and applied severe pressure with his knee to the side of Pitts's face. Jackson grabbed Pitts's foot and twisted it until it would move no further, slammed the knee into the concrete floor several times, then twisted the foot again. *Id.* p. 7. Plaintiff's leg irons, handcuffs, and shorts were removed. The officers exited the cell except for Jackson and Bare. Bare then administered pepper spray twice, left the cell, and closed the door. Pitts washed off the spray with water from the toilet because the water pressure in the cell was too low. Pitts pressed the intercom numerous times for medical attention. When Deal and Larson checked on him, Pitts told them that he needed medical attention and was having difficulty breathing from the pepper spray. Pitts alleges he was not seen by medical providers for two or three hours. Larsen allegedly filed "false" charges against him later that evening. *See id.*

---

[4] Although Pitts claims that defendants Bare, Larsen, and Jackson, and Officers Williams and Harp were involved with him in the holding area, Detention Center records show that only defendants Bare, Jackson, and Harp were working that shift on October 27, 2009, and in positions from which they were available to be called to where plaintiff was housed at the time. Def. Exhibit 38, ¶ 19. Larsen was not working where he would be available to leave the C Block, and Williams was not working that shift. Defs. Exhibit 38, ¶ 19.

**B. Infraction**

In November of 2009, Pitts returned to the general prison population and joined other Muslim inmates in filing a class action suit. He received a "false infraction," which was allegedly issued to return him to disciplinary segregation. Complaint, p. 7. "Around the holiday," Pitts completed the forms, placed them in an envelope, which was signed, sealed, and stamped, and gave the envelope to one of the officers working on the C-Block. Pitts believes the papers "never made it out of the jail or to the Maryland (District of Maryland) court." Pitts returned to administrative segregation sometime thereafter. He states that he was in segregation from September through November, and notes that he attempted to "assist two other inmates in filing claims after being injured by c/o." Complaint, p. 8.

**C. Threats to Officers**

On or about January 13, 2010, Pitts went to the mental health unit for medication for post-traumatic stress disorder. The mental health provider asked Pitts about his feelings toward corrections officers. Complaint, p. 8. Pitts's statements were "passed on" to Major Elliott who issued a "false memorandum" on January 13, 2010, which placed Pitts on administrative segregation for threatening bodily harm to corrections staff. The memorandum directed that Pitts wear leg irons and handcuffs during recreation. Pl. Ex. 1. Subsequently, Major Elliott issued another memorandum that 1) limited Pitts to recreation on Mondays, Wednesdays, and Fridays and then for only fifteen minutes each time; 2) required him to shower handcuffed and shackled; and 3) prohibited him from using the telephone or watching television.

4

### D. Mail Claim

On March 5, 2010, defendants Elliott, Hopkins, and Turner of the Intel Unit intercepted a letter Pitts sent to his cousin Jordan Criner. The letter was forwarded to defendant Cook of the Maryland State Police. Pitts alleges that Cook blackmailed, coerced, and threatened Criner to write a letter to Pitts containing false statements about executing a "hit." Complaint, p. 9.

### E. March 16, 2010

On March 16, 2010, Sgt. Steven[5] and other officers brought Pitts to his court proceeding. Pitts claims that excessive force was used against him and he was forced to appear in Circuit Court in a prison uniform without shoes and without his legal documents. Upon his return to his cell after court, Pitts found that his cell had been searched and a sealed letter addressed to his grandmother and legal papers were missing. Pitts complains the search was made at the request of an outside law enforcement officer, Cook, and without a warrant or without probable cause. Pitts claims he was refused an ARP form to complain about the search.

On March 17, 2010, Pitts was served with papers charging him with soliciting the murder of Latoya Robinson, a witness against him in an upcoming case. Pitts was transferred from the Wicomico County Detention Center to the Division of Corrections's Maryland Reception, Diagnostic, and Classification Center on April 1, 2011.

### III. CORRECTIONAL DEFENDANTS' RESPONSE

The correctional defendants dispute Pitts's allegations and have submitted verified exhibits in support of their dispositive motion.

The corrections defendants state that prior to the October 27, 2009, use-of-force incident, Pitts posed a serious threat to the safety of staff and inmates and to institutional discipline. The

---

[5]  It is not clear whether Pitts intended to name Sgt. Stevenson or another prison officer.

Division of Corrections had previously identified Pitts as a member of a "Security Threat Group," the gang known as the Crips. Affidavit of Wicomico County Department of Corrections Audit Coordinator Troy S. Abner, Def. Exhibit 38, ¶ 4.[6]

Pitts arrived at the Detention Center on September 9, 2009, where he was placed in the general prisoner population. On September 13, 2009, his fellow inmates asked for his removal from their housing unit. Pitts had smashed the unit television, thereby causing the entire unit to go without television for more than 40 days, and threatened to repeat his actions. The inmates asked for Pitts's transfer to another housing unit to prevent a repeat of his conduct and to maintain inmate morale. Inmate Request Slip, Def. Exhibit 10. On September 14, 2009, Pitts was put in administrative segregation for his own safety. Def. Exhibit 38, ¶ 7; Memo from Col. Thomas Kimball, Def. Exhibit 8; Reasons for Placement of Administrative Segregation Status, Def. Exhibit 9.

On September 14, 2009, Pitts requested to be sent to another jail, stating that he felt threatened by correctional officers and inmates. Def. Exhibit 8, Memo from Col. Thomas Kimball. On October 15, 2009, Pitts submitted another request for transfer based on safety concerns. Inmate Request Slip dated October 15, 2009, Def. Exhibit 14.

On September 15, 2009, a Detention Center staff member filed a report that Pitts had stated voices were telling him to hurt someone and that he felt as if he could hit someone with his hands and as if he could lash out. Incident Report dated September 15, 2009, Def. Exhibit 11.

---

[6] Exhibits submitted by the corrections defendants are cited as "Def. Exhibit." Exhibits submitted by Sgt. Scott Cook are designated "Def. Cook Exhibit."

On September 22, 2009, Plaintiff refused another housing assignment, disobeying the correctional officer's order to pack up and move. Notice of Infraction or Incident dated September 22, 2009, Def. Exhibit 12. At his disciplinary hearing on September 28, 2009, Pitts said he was afraid of other gang members or "blood dudes." Disciplinary Hearing Report, Def. Exhibit 13. After the disciplinary hearing, Pitts was placed on lockdown/administrative segregation until October 28, 2009. *Id*. p. 2.

On October 8, 2009, Pitts kicked a file cabinet, broke the file cabinet door, and broke a wall pocket in the Classification Office. Def. Exhibit 38, ¶ 11. On October 15, 2009, and November 10, 2009, Pitts submitted requests for transfer to another facility for safety concerns. Def. Exhibits 14 and 15. On October 22, 2009, Pitts was put on disciplinary lockdown and administrative segregation until November 11, 2009. On November 11, 2009, he was placed on administrative segregation again and remained on lockdown or administrative segregation until he was placed in general population on December 3, 2009. Def. Exhibit 38, ¶ 10.

### A. October 27, 2009, Use-of-Force Incident

On October 27, 2009, Lt. Kelley reported that Pitts said he was going to kill himself. Def. Ex. 1. Lt. Kelley's memo states:

> Rodney Pitts had a meeting in the library once the meeting was over and he was escorted back to his cell D-seg #1. Once in there, he said he was going to kill himself. He was taken to see mental health and they advised that he was to go on suicide watch. Once he was placed on suicide watch and the staff was walking out of the cell he jumped up at the officers that's when he was sprayed. He was seen by medical then taken to central booking for housing on suicide watch.

Def. Exhibit 1.

Pitts was brought to the nurse at the Mental Health Office and at approximately 1450 hours (2:50 pm) was placed on suicide watch for his own safety. Def. Exhibits 2 and 38, ¶ 13. Pitts refused to cooperate and to allow officers to remove his handcuffs and shackles so that he could undress and be placed in a suicide gown. Def. Exhibit 3D. Instead, he became "combative." *See id.* As a result, Pitts was forcibly undressed. "Use of Force Reports" Sgt. Stevenson, Officer Cottman, Officer Davis, and Officer Schoolfield, Def. Exhibits 3A, 3B, 3C, and 3D. Officer Cottman held the back of Pitts's neck and right arm down while the other officers removed Pitts's clothing. Def. Exhibit 3B. Officer Davis held Pitts's right leg and right arm. Def. Exhibit 3C. As Sgt. Stevenson backed out of the cell, Pitts stood up with his fist clenched and moved toward him. Def. Exhibit 3A. At that point, Sgt. Stevenson administered a one-second burst of pepper spray. *See id.*

Pitts was taken to the medical unit for treatment at 1525 hours (3:25 pm). Def. Exhibits 4A, 38 ¶ 15, and 36 at Part I. Pitts told the medical provider that he had been sprayed with pepper spray. The medical report states that Pitts denied any pain or injury. Def. Exhibit 4A.

The medical treatment form indicates that Pitts refused to cooperate during the medical examination and denied pain or injury. *Id; see also* Def. Exhibit 38, ¶ 13. Pitts was examined again at 4:30 p.m. Examination revealed left eye swelling and discomfort, ankle pain, and superficial scratches on the arms. Def. Exhibit 4B. Pitts refused ice to treat his complaints of injury. *See id.* The medical record indicates that a correctional officer washed Pitts's face before he was seen by medical providers. *See id.* Pitts walked without problems, exhibited a full range of motion, and showed no discoloration on his face or ankle. *See id.* Superficial scratches on Pitts's arms were treated with topical antibiotic ointment. *See id.* Pitts refused to make a

statement about the incident. Def. Exhibit 5. The Use of Force Review for the incident concluded that Pitts had posed an imminent threat to safety at the Detention Center and the force used was appropriate. Def. Exhibit 6.

In regard to Pitts's assertions that he had only toilet water to wash the pepper spray off his body, defendants counter that if there was water in the toilet, then there was water in the sink because of plumbing connections in inmate cells. Def. Exhibit 38, ¶ 21.

## B. Infraction

One day after he was put on suicide watch, Pitts returned to Segregation Unit D. Def. Exhibit 16. Pitts's housing record shows that he was not placed in the general population in November of 2009, but in fact was housed in administrative segregation for the entire months of October and November 2009. Def. Exhibits 7 and 38, ¶ 5. He returned to general population housing on December 3, 2009. Def. Exhibit 38, ¶ 5.

Defendants explain there was no difference between Pitts's housing facilities in a general population on the C Block where he was housed from December 3, 2009, to December 14, 2009, and in a cell in segregation in D Seg, where he was placed after December 14, 2009. Def. Exhibit 38, ¶ 6. Each of the cells in the general population pod in which Plaintiff was housed is a single-occupant cell with a door that can be locked or opened to provide access to a common day room for recreation. *Id.* Inmates in segregation may have more limited recreation time than inmates in general population on the C Block where Plaintiff was housed when he was in general population. *Id.* When an inmate is in administrative or disciplinary segregation in D Seg, his status is checked and a record noted of the status check every thirty minutes. *Id.*

9

Pitts was in general population from December 3, 2009, to December 14, 2009. He committed an infraction on December 7, 2009, and was found guilty at a hearing. As a result, he was placed on thirty days' probation, but not put back in segregation. Notice of Infraction or Incident and Disciplinary Hearing Officer Report, Def. Exhibits 18 and 19.

On December 8, 2009, Pitts was given an infraction for clogging the toilet in his cell so that it overflowed into the hallway. Def. Exhibit 38, ¶ 24. At his disciplinary hearing on December 14, 2009, Pitts was informed that he would receive thirty days' lockdown for interfering with and misusing county property. Pitts accused the hearing officer of participating in a conspiracy against him. Def. Exhibit 22, Incident Report by Hearing Officer Patricia Allen-Dark. Pitts removed his hand from the handcuff, grabbed the infraction papers off the desk, and ripped them. *See id.* The hearing officer recommended that Pitts remain in handcuffs and leg irons when away from his housing unit because he was an escape risk. Def. Exhibit 22.

On January 12, 2010, Nurse Johnson in the Mental Health unit reported Pitts admitted to having homicidal thoughts about Officers Larson and Jackson. Pitts said that he would stab the officers if he could. Def. Exhibit 25. As a result, on January 13, 2010, Major Richard Elliot put Pitts on administrative segregation and required him to wear leg irons and handcuffs during recreation. Def. Exhibit 26.

### C. Prisoner Mail

The Wicomico County Detention Center opens and examines inmate mail in accordance with the mail screening policy issued by the United States Postal Service. Def. Exhibit 30 (authorizing Wicomico County Office of Corrections to inspect inmate mail). Pitts was provided written notice of the mail policy when he first arrived at the Detention Center. *See id.*

On March 5, 2010, Master Correctional Officer Richard Elliott opened and reviewed Pitts's letter to Criner[7] in accordance with the U.S. Postal Services screening procedures for corrections institutions and noted its reference to carrying out a hit on Pitts's girlfriend, who was scheduled to testify against him as a witness in an upcoming trial on March 16, 2010. Def. Exhibit No. 31; Def. Cook Exhibit 2 (March 2, 2010, letter from Pitts to Criner). The letter asked Criner to threaten, beat, kidnap, or kill Latoya Robinson to prevent her from testifying at Pitts's upcoming trial. *See id.* Pitts described his girlfriend and her sister and their vehicles in the letter. Pitts also provided their home and work addresses. Def. Exhibit 31.

Detention Center officials contacted the Maryland State Police, and Sergeant Cook was assigned to investigate the matter. On March 17, 2010, Pitts was charged with solicitation to murder and solicitation to assault. Def. Exhibit 38, ¶ 37.

## IV.    SERGEANT COOK'S RESPONSE

Sgt. Scott Cook, a member of the Department of the Maryland State Police assigned to its homicide unit, investigated Pitts's March 2, 2010, letter to Jordan Criner. Def. Cook, Exhibit 1, Declaration of Sergeant Scott Cook. Cook went to Criner's parents' house where he advised Criner of the reason for his visit and gave him a copy of the letter Pitts had intended to send to him. Def. Cook Exhibit 1, ¶ 6. Cook asked Criner to write a "controlled letter" responding to Pitts informing him that Criner could perform the tasks requested. *See id.* ¶ 7. As Criner wrote the letter, Cook instructed him to ask questions such as how much Pitts was willing to pay for the hit and specifically what Pitts wanted done to Ms. Robinson. *See id.* Cook instructed Criner to

---

[7] Pitts signs his letters with his street names and aliases, "Big cuz/brother, scar," "Dat Nigga," and "Freaky C." Def. Cook Exhibits 3 and 5.

use the same tone, jargon, and handwriting in the letter and in addressing the envelope that he usually used in letters to Pitts.

On March 8, 2010, Cook took Criner's letter and addressed envelope to the Berlin, Maryland, Post Office where he instructed the postal clerk to postmark and return the envelope to him. *Id.* ¶ 8. On March 9, 2010, Cook personally delivered Criner's letter to Detention Center Intelligence Officer Hopkins for delivery to Pitts. *Id.* ¶ 9. Cook asked that 1) all incoming and outgoing non-legal mail be photocopied for his review; 2) no mail addressed to Criner be mailed out; and 3) incoming mail from Criner be intercepted and not delivered to Pitts until Cook reviewed it. *See id.* Officer Hopkins gave the letter to mail clerk Suzette Davis, who logged it on the Detention Center's mail sheet prior to delivering it to Pitts. *See id.* Davis hand-delivered the letter to Pitts and he signed the mail sheet acknowledging receipt of the letter. Def. Scott Exhibit 4, p. 4.

On March 12, 2010, Detention Center mail staff intercepted and photocopied an outgoing handwritten letter dated March 11, 2010, from Pitts to Criner. *See id.* at ¶ 11. The March 11, 2010, letter responded to the "controlled" letter from Criner to Pitts. It detailed what Pitts wanted done to Ms. Robinson and the price he was willing to pay and directed Criner to avoid shooting upstairs where his children would be sleeping. *See id.* A photocopy of the letter was provided to Cook. *See id.* ¶ 12.

Cook, concerned that Pitts might be soliciting others to commit the crime, contacted Detention Center intelligence personnel on March 14, 2010, and arranged to have Pitts's cell searched on March 16, 2010, while Pitts went to court. Cook and Wicomico County Assistant State's Attorney Christine Ross frequently discussed the investigation. *See id.* at ¶ 13. During

one conversation, Cook asked ASA Ross about the letters Pitts had attempted to mail to Criner. He also advised her that he intend to file an application for statement of charges against Pitts. Ross agreed filing charges was appropriate. *Id.*

On March 15, 2010, Cook filed the application for statement of charges stating that Pitts had solicited Criner to shoot Ms. Robinson. *See id.* at ¶ 14; Def. Cook Exhibit 5. The application was approved, and Pitts was charged with soliciting murder in the first degree and soliciting assault in the first degree. Def. Cook Exhibit 1, ¶ 14; Exhibit 7, Arrest Warrant.

On March 16, 2010, Detention Center personnel searched Pitts's cell. Cook was attending Pitts's court proceeding and was not present during the cell search. Def. Cook Exhibit 1, ¶ 15. On March 17, 2010, Cook met with Pitts in an office in the central booking area at which time Pitts signed a form indicating that he understood and waived his constitutional rights. *See id.* Pitts denied sending the March 2, 2010, letter to Criner and said he was "set up." Pitts denied receiving the "controlled" letter. Pitts refused to discuss the March 11, 2010, letter which detailed what Pitts wanted done to Ms. Robinson and left the interview. *Id.* ¶ 18. Pitts was served with a copy of the arrest warrant. Def. Cook Exhibit 7.

On May 10, 2010, a six-count indictment filed in the Circuit Court for Wicomico County charged Pitts with 1) solicitation to commit first-degree murder; 2) solicitation to commit first-degree assault; 3) solicitation to commit second-degree assault; 4) solicitation to intimidate a juror, 5) intimidating/influencing a juror, and 6) obstruction of justice. Case No. 22K10000342. Def. Cook Exhibit 8. On October 21, 2010, Pitts was found guilty after trial of solicitation to commit first-degree assault and obstruction of justice and acquitted of solicitation

to commit first-degree murder. *Id.* He was sentenced to twenty years' incarceration for solicitation to commit first-degree assault and five years for obstruction of justice. *See id.*

## V.     STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) directs district courts to grant summary judgment if the moving party shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." If the moving party carries this burden, then summary judgment will be denied only if the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. *See* Fed.R.Civ.P. 56(e)(2). To carry these respective burdens, each party must support its assertions by citing particular parts of materials in the record constituting admissible evidence. *See* Fed.R.Civ.P. 56(c)(1)(A). The court will then assess the merits of the motion, viewing all facts and reasonable inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## VI.    DISCUSSION

### A. Excessive Force Claims

Claims of excessive force by prison officials against convicted inmates are governed by the Eighth Amendment's proscription against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319 (1986).[8] The standard for Eighth Amendment excessive force claims consists of subjective and objective components. *See Hudson v. McMillian*, 503 U.S. 1, 8

---

[8] Insofar as Pitts might have been a pretrial detainee for a portion of his confinement at the Detention Center, the constitutional protections afforded a pretrial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535(1979). "Due process rights of a pretrial detainee are at least as great as the eighth amendment protections available to the convicted prisoner." *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir.1992) (citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir.1988)).

(1992). The subjective component requires that prison "officials act[ed] with a sufficiently culpable state of mind." *Hudson*, 503 U.S. at 8. With respect to the objective component, a plaintiff must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation."

"[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Id.* at 4. "The question is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, __ U.S. __, 130 S. Ct. 1175, 1178 (2010) (quoting *Hudson*, 503 U.S. at 7). Absence of serious injury, however, is not irrelevant. The extent of injury could indicate whether the use of force was thought to be necessary and it could provide an indication of the amount of force actually applied. *See id.* at 1178.

On October 27, 2009, at 1450 hours (2:50 p.m.) Pitts was taken from his cell for placement on suicide watch after he had articulated thoughts of suicide. Def. Exhibit 1; Exhibit 38 ¶ 13. The Use of Force Reports completed by the four officers involved indicate that Pitts refused to allow removal of his handcuffs, shackles, or prison uniform so that he could be placed in a suicide gown. Consequently, he was forcibly undressed. When Pitts, with his fist clenched, came toward the last officer, Sgt. Stevenson sprayed him with pepper spray for one second. Def. Exhibit 3A. Pitts was taken to the Medical Unit at 1525 hours (3:25 p.m.). Pitts did not cooperate during the medical examination and pepper spray was administered in the medical treatment room. At 1630 hours (4:30 p.m.), Pitts was examined by Nurse Bounds for a follow-up medical examination.

15

Although Plaintiff claims that Defendants Bare, Larsen, and Jackson, and Officers Williams and Harp were involved in a subsequent incident in the holding area, Detention Center records show the only officers working that shift in positions from which they were available to be called to Plaintiff's housing unit were Bare and Jackson, and Officer Harp. Def. Exhibit 38, ¶ 19.

In order to place Pitts on suicide watch and ensure his safety, the officers briefly applied necessary force to dress him in a suicide gown. The force was applied only after Pitts refused to comply with the guards' orders and became combative. When Pitts came toward the last officer in his cell in a menacing stance, a one-second burst of pepper spray was used. The brief application of pepper spray was not applied to inflict pain nor did it inflict lasting injury. The force was reasonable and not excessive. Pitts was evaluated twice by medical personnel afterwards. His behavior in the medical unit resulted in a second brief application of pepper spray. Pitts was able to wash the spray off by himself and with the help of an officer. Defendants' actions were limited, brief, and necessary under the circumstances to secure Pitts's safety under suicide watch.

On March 16, 2010, after Pitts refused to get ready for transport to a court appearance, a five-member extraction team placed him in leg irons and took him out of his cell. The DVD recording of the cell extraction shows that Pitts was ordered to dress, he refused, and the team entered his cell. Exhibit 32.[9] The DVD shows a brief use of force tailored to extract Pitts from his cell.

---

[9]  The DVD shows officers instructing Pitts to stop resisting. At one point Pitts falls. Although Pitts claims he was dropped on the floor of the cell, his account cannot be confirmed from the tape. The DVDs submitted by defendants also show encounters between corrections officials and Pitts on March 12, 2010.

Viewing the facts in the light most favorable to Pitts, there is no evidence that defendants applied force with malicious or sadistic intent. Defendants were obligated to transfer Pitts, on October 27, 2009, to suicide watch and on March 16, 2010, to a court appearance. The force applied to secure his transfers was brief, measured, and necessary to maintain safety and restore order. In sum, there is no genuine dispute as to any material fact and defendants are entitled to summary judgment in their favor.

## B. Conditions of Confinement Claims

The Eighth Amendment protects prisoners from cruel and unusual living conditions. *See Rhodes v. Chapman*, 452 U.S. 337 (1981).[10] In order to state a constitutional claim premised on prison conditions, a plaintiff must allege that the challenged conditions resulted in a deprivation of a basic human need that was objectively "sufficiently serious" and that, subjectively, the defendant prison officials acted with a sufficiently "culpable state of mind" with regard to the conditions. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991). To satisfy the objective element of a conditions claim, the plaintiff must show that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions. *See Strickler v. Waters*, 989 F.2d 1375, 1380-81 (4th Cir. 1993). Isolation, inactivity, discomfort, and inconvenience do not in and of themselves violate the Constitution. *See In Re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471-72 (4th Cir. 1999). "The Constitution ... 'does not mandate comfortable prisons,' and only those deprivations denying 'the minimal

---

[10] Conditions-of-confinement claims for pretrial detainees are evaluated under the Due Process Clause of the Fourteenth Amendment, rather than under the Eighth Amendment. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 534 n.16 (1979). As a practical matter, the analysis under the Due Process Clause and the analysis under the Eighth Amendment are materially indistinguishable. *See, e.g., Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir.1999); *Hill v. Nicodemus*, 979 F.2d 987, 990–92 (4th Cir. 1992).

civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. at 298.

Pitts generally alleges Warden Kaloroumakis and Deputy Director Roberts acted with deliberate indifference to his welfare, safety, and living conditions. Complaint, p. 15 ¶¶ 5-7. Apart from claiming Kaloroumakis and Roberts failed to respond to a letter he wrote to them on March 16, 2010, Pitts provides no factual predicate to support his conditions claim against either defendant. To the extent Pitts might premise the claim on a theory of supervisory liability, he fails to allege facts to hold either defendant culpable for the actions of his subordinates. *See Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984); *Shaw v. Stroud*, 13 F.3d 791, 798-99 (4th Cir. 1994). In sum, Pitts fails to state a constitutionally cognizable claim against either Warden Kaloroumakis or Deputy Director Roberts.

Next, Pitts complains that Major Elliott removed him from the general prison population and put him in administrative segregation. Complaint, p. 3, ¶ 9. To the extent Pitts raises a conditions-of-confinement claim against Major Elliott, counsel for the correctional defendants argues that Pitts's request for injunctive relief as to this claim has been rendered moot by his transfer to another correctional facility. The court agrees. Article III of the Constitution limits the judicial power to "actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted). A case becomes moot when the issues presented are "no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Where injunctive relief is requested in an inmate's complaint, it is possible for events occurring subsequent to the filing of the complaint to render the matter moot. *See*

*Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (transfer of prisoner moots his Eighth Amendment claims for injunctive and declaratory relief); *see also Slade v. Hampton Roads Regional Jail*, 407 F.3d 243, 248–49 (4th Cir. 2005) (pretrial detainee's release moots his claim for injunctive relief); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987) (holding that the transfer of a prisoner rendered moot his claim for injunctive relief).

Even were this claim not rendered moot by his transfer, Pitts fails to sustain his burden to show that genuine questions of fact remain as to this claim. Restrictive or harsh conditions do not amount to unconstitutional punishment. *See Rhodes*, 452 U.S. at 347. Pitts's poor adjustment history and threats to harm himself and others at the Detention Center led to his placements on administrative segregation and other restrictions. Pitts fails to show the conditions of administrative segregation or his shackling when out of his cell or at recreation amounted to serious deprivation of a basic human need. Pitts was placed on administrative segregation at times for safety concerns and at other times for rule infractions. Notably, Pitts does not allege that he sustained any significant injury as a result of his placement in administrative segregation or restrictions on his movement. Pitts provides no facts suggesting that the defendant acted with a culpable state of mind sufficient to give rise to a constitutional violation. Accordingly, Major Elliott is entitled to summary judgment in his favor as to this claim.

## C. Medical Needs

Pitts's next claim is that defendants Deal and Stevenson showed deliberate indifference to his serious medical needs after he was pepper sprayed on October 27, 2009. The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle*

*v. Gamble*, 429 U.S. 97, 102 (1976). When prison officials show "deliberate indifference" to a prisoner's "serious medical needs," their actions or omissions give rise to an Eighth Amendment violation. *Id.* at 104.[11] In order to prove such a claim, a plaintiff "must demonstrate that the officers acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." *Iko v. Shreve,* 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Estelle,* 429 U.S. at 104). The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir. 1990). A defendant must know of and disregard an excessive risk to inmate health or safety.

In this case, the alleged time interval between administration of the spray and medical evaluation was at most two hours. The record shows that Pitts was able to wash the pepper spray from his body during this time and was later examined at the medical unit. A one- or two-hour delay between administration of the spray and his examination by medical personnel does not rise to the level of deliberate indifference to an inmate's serious medical needs, and summary judgment will be entered in favor of defendants.

### D. Due Process

Pitts complains that his placement on disciplinary and administrative segregation, the interception of his outgoing mail, and the cell search violated due process. In order to prevail on a due process claim, an inmate must first demonstrate deprivation of life, liberty, or property by

---

[11] To state a § 1983 claim for inadequate medical care, a pretrial detainee or prisoner must show a defendant's deliberate indifference to his serious medical needs in violation of his due process rights. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Young v. City of Mount Rainier,* 238 F.3d 567, 575 (4th Cir. 2001).

governmental action.[12]  *See Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997).  Segregated

confinement generally does not present the type of atypical, significant deprivation in which a

state might conceivably create a liberty interest.  *See Sandin v. Connor*, 515 U.S. 472, 486

(1995).  The Fourth Circuit has held that "changes in a prisoner's location, variations of daily

routine, changes in conditions of confinement (including administrative segregation), and the

denial of privileges [are] matters which every prisoner can anticipate [and] are contemplated by

his original sentence to prison ...."  *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991).

Generally, prisoners do not have a constitutionally recognized liberty interest in a particular

security classification or prison placement.  *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (no

constitutional right under the Due Process Clause to a particular security classification or prison

placement).  An inmate does not have a constitutional right to be confined in a particular

location.  *See Olim v. Wakinekona*, 461 U.S. 238 (1983); *Meachum v. Fano*, 427 U.S. 215

(1976).  Pitts had no protected liberty interest in remaining in the general prisoner population,

and his complaints concerning his placement in segregation units does not give rise to a due

process violation.

In regard to the search of his cell and interception of mail, inmates do not have a property

interest in their cell or the property in the cell.[13]  *See Hudson v. Palmer*, 468 U.S. 517, 525–26

(1984).  Further, "[c]ontrol of the mail to and from inmates is an essential adjunct of prison

---

[12] Pitts does not take issue with the procedural process afforded to him during his disciplinary hearings.  In prison disciplinary proceedings where a prisoner faces the possible loss of good conduct credits, he is entitled to certain due process protections. *See Wolff v. McDonnell*, 418 U.S. 539 (1974).  These include advance written notice of the charges against him, a hearing, the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision. *See Wolff*, 418 U.S. at 564–71. Substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence." *See Superintendent, Mass. Correctional Institute v. Hill*, 472 U.S. 445, 455 (1985).

[13] Maryland law provides sufficient due process by affording inmates an adequate post-deprivation remedy for loss of property. *See Parratt v. Taylor*, 451 U.S. 527, 542-44 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).  Pitts may seek redress for the loss of property under state law.

administration and the maintenance of order within the prison." *McCloskey v. State of Maryland*, 337 F.2d 72, 74 (4th Cir. 1964). Pitts cites no precedent to support his claim that the Warden's failure to respond to his letter amounted to a constitutional violation.

### E. Equal Protection

Pitts fails to allege how he was treated differently from others similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. *See Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Accordingly, the complaint fails to state a valid equal protection claim.

### F. Fourth and First Amendment

Pitts had no cognizable expectation of privacy in his cell. The Supreme Court of the United States has ruled:

> A prison shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. We strike the balance in favor of institutional security, which we have noted is central to all other corrections goals.... We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

*Hudson*, 468 U.S. at 525-26. Special governmental needs justify searches without need for individualized suspicion, probable cause, and issuance of warrants. *See Lanza v. State of New York*, 370 U.S. 139, 143 (1962). In this case, there was concern that Pitts might be soliciting others in addition to Jordan Criner to perform a "hit."

Although inmates do not forfeit all constitutional protections by reason of their conviction and confinement, it is well-settled that upon entering into confinement, a prisoner's constitutional rights are limited by the legitimate penological needs of the prison system. *See*

22

*Bell v. Wolfish*, 441 U.S. 520, 545 (1975). These rights may be curtailed in furtherance of the legitimate goals or objectives of the correctional institution. *Id.* A prisoner's constitutional rights may be impinged by a prison regulation only if the regulation is reasonably related to legitimate penological interests. *See Turner v. Safley*, 482 U.S. 78, 89 (1987); *Alizer v. Deeds*, 191 F.3d 540, 547 (1999). When evaluating the constitutionality of prison regulations, courts must accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547.

In this case, there was a clear penological interest in insuring that inmates do not continue to commit criminal behavior while incarcerated. Pitts's cell was searched and his mail was opened and intercepted consonant with that purpose and stated prison regulations. Defendants note that none of the mail opened was marked as confidential legal mail. Accordingly, Pitts was not entitled to be present when it was opened and inspected. *See United States v. Stotts*, 925 F. 2d 83, 88-90 (4th Cir. 1991). Defendants' actions were reasonably related to legitimate penological interests, and they are entitled to summary judgment in their favor as a matter of law.

## G. Retaliation and Religious Discrimination

Pitts alleges that he was placed on segregation in December 2009 for writing a class action for himself and other Muslim inmates. The record supports defendants' response that Pitts's placement in segregation was neither discriminatory in intent nor in retaliation for pursuing litigation. In fact, matters of prison management, safety concerns for Pitts and others, and Pitts's threats to officers led to his placement in segregated housing. Pitts provides no factual basis to support these otherwise unsupported and conclusional allegations.

### H. Malicious Prosecution

Lastly, Pitts complains that Cook lacked probable cause and engaged in malicious prosecution by requesting the cell search. It is clear that Sgt. Cook did not participate in the search of Pitts's cell. Cook was at Pitts's court proceeding when Detention Center staff conducted the cell search. This court notes that the Fourth Circuit has ruled "that there is no such thing as a § 1983 malicious prosecution claim." *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000). The cause of action "is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution." *Id.* A claim premised on a Fourth Amendment seizure requires demonstration of the four elements of the analogous common law tort of malicious prosecution: 1) the initiation or maintenance of a proceeding against the plaintiff; 2) termination of the proceeding favorable to the plaintiff; 3) lack of probable cause to support that proceeding; and 4) the defendant's malice. *Id.* at. 260. Pitts does not satisfy all four elements of the cause of action. The proceeding did not end in his favor because he was found guilty of solicitation to commit assault in the first degree and obstruction of justice. Given the evidence after investigation, there was ample evidence on which to submit a statement of charges against Pitts. Finally, there is no evidence that Cook acted with malice against Pitts during the investigation or any other time. Pitts has failed to set forth a claim for the common law tort of malicious prosecution.

## VII.   CONCLUSION

For these reasons, summary judgment shall be granted in favor of the correctional

defendants and Sgt. Cook.   A separate order follows.

Nov. 30, 2011
Date

James K. Bredar
United States District Judge